# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DONALD PEVIA,                                    *

Plaintiff                                        *

v                                                *          Civil Action No. ELH-16-3810

WEXFORD HEALTH SOURCES, INC.,                    *
*et al.*,
Defendants                                       *

                                             ***

## <u>MEMORANDUM OPINION</u>

Donald Pevia, a self-represented Maryland prisoner confined at the North Branch Correctional Institution ("NBCI"), filed suit under 42 U.S.C. § 1983 against Wexford Health Sources, Inc. ("Wexford") and Ali Yahya, M.D. ECF 1. He alleges the denial of constitutionally adequate medical care. *Id.*

Pending is a renewed motion to dismiss or, in the alternative, for summary judgment filed by Wexford and Yahya. ECF 29.[1] It is supported by a memorandum (ECF 29-3) (collectively, the "Motion") and exhibits. Plaintiff opposes the Motion (ECF 31; ECF 37) and submitted exhibits. Defendants filed a reply. ECF 33.

No hearing is necessary to resolve the motion. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendants' Motion, construed as one for summary judgment, shall be granted.

---

[1] I previously denied defendants' motion to dismiss, or in the alternative, for summary judgment (ECF 15), without prejudice, having found that defendants did not fully address all of plaintiff's claims. ECF 23; ECF 24. Their renewed motion relies on the memorandum and exhibits attached to it as well as on the memorandum and exhibits attached to their initial motion. I have also considered plaintiff's responses filed in opposition to the initial motion. ECF 19; ECF 21; ECF 31.

# I. Factual Background

## A.

Plaintiff explains that in 2006, before his incarceration, he injured his knee playing basketball, suffering a dislocation, fracture, and torn ligaments. ECF 1 at 3. He claims that the torn ligaments caused his knee to "constantly slip[] out of place." According to plaintiff, between 2013 and 2016, he "has complained about his knee." *Id*. Plaintiff alleges that in February 2013, he was seen by medical staff at NBCI due to his complaints that his knee "constantly slipp[ed] out of place and swell[ed] to the size of a softball." *Id*. Plaintiff states that an x-ray was ordered and, on an unspecified date, he was provided a steroid injection. *Id*.

In June of 2016, plaintiff's knee again slipped out of place and "swelled up." *Id*. He was seen by RNP Krista Swann. *Id*. at 4. X-rays were ordered, which showed that plaintiff's knee had multiple bone spurs and that the space within his knee was decreased. *Id*. There were also three "large lumps" on his knee. *Id*. Pain medication was prescribed. *Id*.

A request was made for plaintiff to be seen by an orthopedist. However, it was denied by Wexford's review process. *Id*. at 5. Instead, on September 15, 2016, it was recommended that plaintiff undergo a steroid injection. *Id*. Plaintiff was advised that only Dr. Yahya could override the decision. *Id*.

Plaintiff saw Dr. Yahya for the injection on October 29, 2016. *Id*. Plaintiff states that Yahya advised him that the referral to an orthopedist was likely denied because plaintiff could still walk. *Id*. at 6. Plaintiff asked if Dr. Yahya could order the consultation but he said, "no." *Id*. Yahya provided the injection (*id*. at 6-7) and ultimately plaintiff developed an infection at the injection site, which required additional treatment. *Id*. at 7-8. Another request for plaintiff to be seen by an

orthopedist was submitted in November of 2016. *Id.* at 8. Plaintiff complains that knee surgery should have been provided.

**B.**

In support of their Motion, defendants submitted various exhibits, including the affidavits of Robustiano Barrera, M.D. and Asresahegn Getachew, M.D., and relevant portions of plaintiff's medical records from February 26, 2013 through February 2, 2018. ECF 15-4 (medical records); ECF 15-5 (Barrera Affidavit); ECF 29-4 (medical records); ECF 29-5 (Getachew Affidavit).

Plaintiff's medical records reflect that he has a history significant for Hepatitis C Virus, hypertension, shoulder pain/dislocation, and left knee pain. ECF 29-5, ¶ 3. Relevant to the allegations raised in this case, on February 26, 2013, plaintiff was evaluated by Colin Ottey, M.D., due to plaintiff's complaints of sharp pain in his left knee. ECF 29-4 at 2. Plaintiff explained that he twisted his knee five days earlier. *Id.* His knee was swollen, exhibited a decreased range of motion, and tenderness over the medial aspect. *Id.* Plaintiff was prescribed Ibuprofen and Tylenol-codeine No. 3. *Id.* He was directed to elevate the knee and to use a wheelchair for one week. *Id.* at 3. Dr. Ottey also ordered an x-ray of the knee and directed plaintiff to follow up in two weeks. *Id.* The x-ray, taken on March 5, 2013, revealed mild degenerative changes in plaintiff's knee with no evidence of fracture, dislocation, or subluxation. *Id.* at 7.

The following day, plaintiff submitted a sick call slip seeking the results of his x-ray, extra support for his knee, and renewal of his medications. ECF 29-4 at 8. Dr. Ottey examined plaintiff on March 9, 2013. *Id.* at 9. At that time, plaintiff reported the pain in his knee had improved, but remained swollen and stiff. Plaintiff also reported tingling in his toes when his leg hung from a seat. *Id.* Examination showed tenderness and moderate pain with motion. Dr. Ottey did not

observe any swelling. *Id.* Plaintiff's prescription for Tylenol-codeine No. 3 was renewed and plaintiff was directed to return in two weeks. *Id.* at 9-10.

On March 15, 2013, plaintiff was evaluated by Greg Flury, PA in the chronic care clinic. ECF 29-4 at 12. Flury noted that plaintiff was not due in the chronic care clinic at that time and would be rescheduled. He also noted that plaintiff "denie[d] current complaints" and described plaintiff as in no acute distress and walking unassisted with a normal gait. *Id.*

Flury again evaluated plaintiff on March 25, 2013, in response to plaintiff's sick call complaining of knee pain. *Id.* at 13. Plaintiff advised Flury of his history of "knee pain due to previous t[reatment]" and denied any recent injury. *Id.* The pain increased with flexion. *Id.* Flury reviewed the recent x-rays which showed mild degenerative changes. *Id.* Flury also noted "osteochondral prominence of inferior left patellar pole and tibial tubercle. No effusion. Test[ing] joint laxity negative." *Id.* He prescribed Indomethacin and referred plaintiff for consideration of an injection to the left knee. *Id.* at 14.

On April 30, 2013, plaintiff was seen by Renato Espina, M.D., who aspirated the knee and injected it with a steroid. ECF 29-4 at 15. Plaintiff tolerated the procedure well. *Id.*

Although plaintiff was seen by medical providers over the next three years, he did not again complain of knee pain until February of 2016.[2] ECF 29-5, ¶ 6; ECF 29-4 at 16-20.

On February 3, 2016, plaintiff was evaluated by Taylor Hershberger, RN for his complaint of left knee pain. ECF 29-4 at 23. Plaintiff told Hershberger that his "knee keeps slipping out of place which is caused from torn ligaments. I'm having severe pain in my knee. I'm requesting an MRI for possible surgery." *Id.* Hershberger observed that plaintiff was able to complete the range

---

[2] Krista Swan, RNP, entered a health assessment note on July 21, 2015, which indicated plaintiff had suffered a left tendon laceration in 2009 that was surgically repaired. ECF 29-4 at 20.

of motion exercises and there was no swelling in the knee. He walked into the examination room with a steady gate and was able to get on and off the exam table without difficulty. He had a current prescription for Mobic and he was encouraged to complete stretching exercises and to apply warm/cool compresses as needed. *Id*. Approximately one week later, plaintiff submitted a sick call slip, asking to see the doctor and for an MRI, due to his knee continuing to slip out of place even when wearing his knee brace. *Id*. at 26. He submitted a second sick call slip the following week, complaining of sharp pain in his knee, which he attributed to the torn ligament and sought referral for an MRI. *Id*. at 27. He noted that he had already been provided an x-ray and cortisone shot and the knee brace did not sufficiently hold the knee in place. *Id*. He also requested renewal of his bottom bunk status. *Id*.

On February 20, 2016, plaintiff was evaluated by Tammy Buser, RN. *Id*. at 28. Buser described plaintiff as walking with a steady gait but also as having poor range of motion in the knee and pain below the knee "cal." *Id*. Plaintiff had active prescriptions for pain medications and his bottom bunk status was renewed. *Id*.

In response to plaintiff's sick call slip dated June 11, 2016, asking to have his bottom bunk status renewed and to see medical regarding his knee (ECF 29-4 at 30), plaintiff was seen by Krista Bilak, RNP on June 14, 2016. Due to plaintiff's chronic knee and shoulder disorders she renewed his medical assignment to the bottom bunk. *Id*. at 31. Pevia was directed to follow up if his condition persisted or worsened. *Id*. at 32.

On June 22, 2016, plaintiff was examined by Ricki Moyer, RN. ECF 29-4 at 34. Plaintiff advised that he had a torn medial tendon prior to coming to prison and that he had been treated with ice, elevation, and medication. He reported that "he was exercising and 'felt something snap' and his knee is 'messed up again'". *Id*. Moyer observed that plaintiff's gait was independent and

steady; his knee was moderately swollen; there was a bony prominence in the area of the patella; and he had scarring from possible surgery to the medial side of patella.[3]  *Id*.  He was directed to elevate the area and apply ice/cool compresses.  *Id*.  He had active analgesic pain prescriptions at that time.  He was referred to the provider for further evaluation and treatment.  *Id*. at 36.

Kirsta Bilak, RNP evaluated plaintiff in the chronic care clinic on July 2, 2016.  ECF 29-4 at 37.  Relevant to his knee, she noted: "Pt has old injury to left knee in 2006-posterior spurring medial tibial plateau-fracture of medial tibia. Pt reinjured knee 1 week ago. Unable to place weight on left leg. Reports knee gives out and dislocates."  *Id*. at 38.  She also observed that plaintiff's left knee was swollen and he experienced severe pain with motion.  She wrote, "Pt appears deformed.  Unable to palpate any area of the patella.  Can not weight bear."  *Id*.  His pain medication, including Mobic, Baclofen, Tramadol, and Tylenol-codeine No. 3, were continued.  Bilak ordered an x-ray of plaintiff's knee and directed him to return in one week for follow-up.  *Id*. at 38-39.

Plaintiff returned to Bilak on July 13, 2016.  ECF 29-4 at 40.  The results of the x-ray showed "degenerative changes with reduced joint spacing and osteophytes."  *Id*.  Bilak noted that plaintiff complained of worsening pain and that his knee was unstable, locked-up, and clicked with movement.  *Id*.  She also observed that plaintiff suffered from weak knee muscles and moderate pain with movement.  *Id*.  At that time, plaintiff was receiving pain medication and wearing a knee sleeve.

---

[3] Plaintiff explains that the scarring was from a childhood accident, not surgery.  ECF 19 at 6.

Bilak requested referral of plaintiff to orthopedics. *Id*. at 40-41. However, on September 15, 2016, the request for orthopedic consult was denied, pursuant to Wexford's review process, in favor of a steroid injection. ECF 31-3 at 1.

In August and September of 2016, plaintiff was seen by various medical providers regarding his dislocated shoulder. He did not express any concerns about his knee during those visits. ECF 29-4 at 42; ECF 15-4 at 15-18.

Bilak again examined plaintiff in the chronic care clinic on October 6, 2016. As to his knee injury she noted that he suffered from chronic left knee pain and had an abnormal x-ray of the left knee. ECF 29-4 at 45. She observed that plaintiff walked with a limp and there was swelling of the left patella. *Id*. Plaintiff's pain medications were renewed, and an order was entered referring plaintiff to a provider regarding his left knee pain and to Dr. Yahya for an injection in the left knee. *Id*. at 46. On October 29, 2016, Dr. Yahya aspirated plaintiff's knee and injected steroids. ECF 15-4 at 23.

Approximately one week later, Krista Bilak, RNP evaluated plaintiff. He reported worsening pain in his knee, as well as increased instability, locking, and clicking. *Id.* at 24. He also reported difficulty with climbing stairs and walking. Bilak noted that the x-rays showed degenerative changes with reduced joint space and osteophytes; the request for an orthopedic consult submitted in July had been denied in favor of steroidal injection which occurred; and plaintiff reported an increase in pain. *Id*. Additionally, he developed an infection at the injection site. *Id*. His medications were renewed, he was prescribed antibiotics, and he was referred for physical therapy. *Id*. at 25.

Bilak also renewed the request that plaintiff be provided an orthopedic consult. *Id*. at 26-27. Notably, on November 17, 2016, the request was approved. *Id*. at 28. In the meantime,

plaintiff continued to be seen by medical providers throughout November and December of 2016. *Id.* at 30-35.

On December 29, 2016, plaintiff was examined by Roy Carls, M.D. Plaintiff told Carls that he dislocated his knee playing basketball ten years ago, with an additional history of a fracture medially on his knee. Throughout the years he had pain in his left knee and reported that he had been unable to participate in activities. He reported the knee felt unstable on a regular basis. ECF 15-4 at 35. After examining plaintiff, Carls noted that it was "[l]ikely he has soft tissue injury to his left knee which is chronic, possibly the medial collateral ligament and also the ACL. Likely he has a medial meniscus tear as well. He does have some accompanying arthritis as well." *Id.* Carls ordered an MRI and directed plaintiff to follow-up with him after the MRI to discuss treatment options. *Id.*

On January 18, 2017, Bilak submitted the request for the MRI ordered by Dr. Carls. *Id.* at 36-39. The request was approved a few days later, on January 26, 2017 (*id.* at 40), and the MRI was conducted on February 23, 2017. *Id.* at 41.

On March 1, 2017, Bilak discussed the MRI results with plaintiff. ECF 15-4 at 47. She referred him back to the orthopedist. *Id.* at 49. Plaintiff was seen throughout March by medical providers for complaints regarding his other leg. *Id.* at 50-54. On March 31, 2017, Bilak noted that plaintiff was waiting for his appointment with Dr. Carls regarding treatment options and she was advised by the scheduler that plaintiff would be seen in April. *Id.* at 55.

Plaintiff returned to Dr. Carls on April 27, 2017. ECF 15-4 at 57. Carls noted that the MRI showed a meniscus tear and full ACL rupture as well as signs of arthritis. *Id.* Conservative treatment had not helped and Carls discussed with plaintiff the need for ACL reconstruction. *Id.*

On May 15, 2017, Bilak submitted a consultation request for left knee surgical repair of plaintiff's meniscus and ACL. *Id*. at 63. On June 5, 2017, Krista Self, RNP examined plaintiff. She noted that he was "diagnosed with left knee meniscus and full ACL tear" and was scheduled with Dr. Carls for a surgical repair. ECF 29-4 at 47.

On June 19, 2017, Dr. Carls performed surgery to repair plaintiff's ACL tear. ECF 29-4 at 49. Plaintiff's post-operative diagnosis included: "1. Left knee anterior cruciate ligament complete rupture. 2. Left knee medial meniscus mid-body, complex tear with a radial flap component. 3. Left knee grade 2-3 chondrosis on the medial femoral condyte and grade 2-3 chondrosis on the trochlea. 4. Left knee abundant synovitis in all 3 compartments and a medial plica." *Id*. He tolerated the surgery well and was returned to the Western Correctional Institution infirmary for follow up care, where he remained until the following day. *Id*. at 51,54-58. Pevia was referred to physical therapy (*id*. at 58-60), which he began on July 6, 2017. *Id*. at 61.

Plaintiff was seen by Krista Self, RNP on July 17, 2017. She prescribed antibiotics, as plaintiff's knee was swollen and warm. ECF 29-4 at 62.

On July 25, 2017, an x-ray of plaintiff's knee was taken. ECF 29-4 at p. 63. There was no evidence of fracture, dislocation, or subluxation. The alignment was described as anatomic. Stable post-operative changes and stable hardware were also observed. There was a small effusion and patellar ostophyte, however "[n]o acute osseous abnormality" was found. *Id*.

Plaintiff returned to sick call on August 9, 2017, complaining of left knee pain due to his cellmate jumping on his knee as he was getting out of his bunk. ECF 29-4 at 64. Plaintiff was concerned that the injury happened after the x-ray on July 25, 2017, and requested an MRI. *Id*. The nurse observed that plaintiff walked without difficulty and that there was no swelling, bruising or limping. *Id*.

Dr. Ashraf saw plaintiff on August 24, 2017. *Id*. at 66. Plaintiff asked for a single cell, explaining that his cellmate had fallen and hit Pevia's left knee. Ashraf discussed plaintiff's case with the administrator, but plaintiff did not qualify for a single cell given that he was already housed in a medical cell with lower bunk status. *Id*. Plaintiff expressed no other concerns. *Id*.

During a scheduled visit with Stephen D. Ryan, Physical Therapist, on September 7, 2017, plaintiff reported that his knee was improving. ECF 29-4 at 68. Ryan described plaintiff as "functionally asymptomatic" and discharged him to self-management. *Id*.

On October 29, 2017, plaintiff was evaluated by Holly L. Pierce, CRNP, due to his complaint of left knee pain, which he described as aching. He reported that the pain was aggravated by bending and relieved by ice and pain medications. He complained of decreased mobility, difficulty going to sleep, instability, and limping. ECF 29-4 at 69. Plaintiff's pain medications were continued. He was directed to ice the area and avoid exercise that increased discomfort. Pierce also ordered x-rays. *Id*. at 69-70.

X-rays were taken on November 9, 2017. *Id*. at 71. There was again no evidence of fracture, dislocation, or subluxation and the alignment was described as anatomical. *Id*. at 71. No acute osseous abnormalities were noted, although mild degenerative changes were observed. *Id*.

Plaintiff was evaluated by Ava Joubert-Curtis, M.D. on November 14, 2017. ECF 29-4 at 72-74. She noted, in part, *id*. at 72:

> 36 yo man who states he 1st injured the left knee in 2006 playing basketball, sustaining torn ACL. He underwent surgery in [sic] June 19, 2017. His post operative course was uneventful until around July 30 when he complained that his cell buddy at NBCI somehow fell on the patient's left knee either coming off the top bunk, or while trying to get onto the top bunk. Also, according to him, he was not able to continue PT at that time due to the pain, and therefore he missed a few sessions until he resumed PT Sept 7. According to the nursing note, Mr. Pevia "was seen in the dispensary 8/9/17 and pt ambulated into medical w/o difficulty, upper and lower exts WNL, no swelling, bruising or limping was noted". He was scheduled to see a provider, but apparently an ROR was completed for the provider

visit scheduled for 8/22/2017. Additionally, according to the Physical Therapy note on Sept 7, 2017 he stated the knee was improving and he was discharged to self management.

He did however, continue to complain of left knee pain, and a follow up x-ray was ordered 11/09/2017 which showed mild DJD.

He is upset that he received his last dose of tramadol last night. This provider explained that narcotic analgesics are not intended to be given indefinitely post-operatively, and is not indicated for the long term treatment of arthritis. He was encouraged to continue the Mobic as his tramadol is weened, however, he responded by telling this provider that he does not take it. This provider is adding ES tylenol (<2gms/day) to take for the pain.

HE IS SCHEDULED TO SEE DR. CARLS ON 11/30/17. While it against policy to share dates of the consultations, he was told he would be scheduled for an Ortho follow up.

Dr. Carls saw plaintiff on November 30, 2017. ECF 29-4 at 75. Plaintiff reported that "his knee is feeling good now." *Id*. Examination demonstrated "excellent patellar motion" with "full extension" and "full flexion." Plaintiff advised Dr. Carls that he "loves to play basketball" but Carls advised him to wait a few more months before resuming full court basketball, although "he could do some shooting around" and do more strengthening exercises for his quadriceps. *Id*.

On February 2, 2018, plaintiff was seen by Holly Pierce, CRNP. He demanded Ultram and Baclofen relative to the injury to his left knee. ECF 29-4 at 76. He repeatedly asked Peirce if she knew who he was and threatened to sue her. The visit was discontinued due to safety concerns. *Id*. At that time, he did have valid prescriptions for Mobic and Tylenol Extra Strength. *Id*.

Dr. Barrera states that in his opinion, to a reasonable degree of medical probability, and after having reviewed plaintiff's medical records, the treatment provided to plaintiff for his left knee injury was appropriate. ECF 15-5, ¶ 14. He avers: "In particular, considering Plaintiff's knee injury had been resolved for many years, it was an appropriate course of treatment to determine if steroid injections would help resolve the inflammation and pain prior to having outside

consultations or an MRI." *Id.* Dr. Getachew also states that in his opinion, to a reasonable degree of medical probability, after having reviewed plaintiff's medical records, plaintiff has received and is receiving appropriate care for his left knee condition. ECF 29-5, ¶ 11.

## II. Standard of Review

A motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When, as here, the movant expressly captions its motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed.) ("Wright & Miller). However, this discretion "should be exercised with great caution and attention

to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v.*

*Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, ___ F.3d ___, 2019 WL 350375, at *6 (4th Cir. Jan. 29. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not moved for discovery in response to the dispositive motion. And, given the production of the medical records, I am satisfied that it is appropriate to address defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III. Discussion

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*,

841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order

to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that

the actions of the defendants or their failure to act amounted to deliberate indifference to a serious

medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th

Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized

the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Nevertheless, "not all Eighth Amendment violations are the same: some constitute

'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878

F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general,

the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's

health and safety, including failing to protect inmates from attack, maintaining inhumane

conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511

U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must

be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and

disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98

(quoting *Farmer*, 511 U.S. at 834, 837-38).

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff

were aware of the need for medical attention but failed either to provide it or to ensure the needed

care was available. *Farmer*, 511 U.S. at 837; *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there

is no expectation that prisoners will be provided with unqualified access to health care). A "'serious

... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40.

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). Although this "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

Thus, the subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). As the *Farmer* Court explained, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S.

at 837. Therefore, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.; Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments."). Therefore, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106). And, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A

plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk . . . ." *Brice*, 58 F.3d at 105.

In *Scinto*, the Fourth Circuit said, 841 F.3d at 226:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In this case, the evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. When plaintiff first began complaining of pain in his left knee in February 2013, he was provided analgesic pain medication and diagnostic imaging, which showed mild degenerative changes. He was seen regularly by medical providers

and on April 30, 2013, he received a steroid injection to the knee. Despite receiving regular medical care for other issues, plaintiff did not again complain of knee pain until February 2016.

At that time, plaintiff reported pain in the knee and advised medical staff that his knee kept slipping out of place, which he attributed to torn ligaments. In February and early June, his medical records show that he was provided analgesic medication and bottom bunk status. On June 22, 2016, he reported that he was exercising and felt something snap. He was directed to elevate and ice the area and was provided additional pain medication. His pain medication was continued in early July and he was also referred for an x-ray of the knee.

The x-rays showed degenerative changes to the knee with reduced joint spacing and osteophytes. Plaintiff continued to complain of pain and instability in the knee. As such, on July 13, 2016, Bilak requested that plaintiff be seen by an orthopedist. That request was denied in favor of a steroidal injection. Plaintiff also continued to receive analgesic pain medication and wore a knee brace.

In October 2016, Pevia received a steroidal injection from Dr. Yahya. After the injection, plaintiff continued to complain of pain. He was referred to physical therapy, his pain medication continued, and Bilak again requested referral to an orthopedist. Significantly, on November 17, 2016, that request was approved.

The orthopedic consult occurred on December 29, 2016, with Dr. Carls. He requested an MRI. The request for MRI was approved in January, the MRI was taken in February, and plaintiff returned to Dr. Carls in April. At that time, Dr. Carls recommended surgery. The surgery was performed on June 19, 2017. After the surgery, plaintiff received physical therapy.

Throughout this period, Pevia was regularly seen by medical staff and was provided with analgesic pain medication. After the surgery, plaintiff also received two x-rays of the knee, which were essentially normal. He was discharged from physical therapy on September 7, 2017.

Plaintiff returned to Dr. Carls on November 30, 2017. At that time, the knee appeared stable and plaintiff was directed to wait a few more months before playing basketball. He was also told to continue to strengthen his quadriceps.

It is clear that Dr. Yahya's only interaction with plaintiff occurred in regard to the steroid injection in October of 2016. Plaintiff argues that when he saw Dr. Yahya, he advised Yahya that his injury had been long standing, he previously had a steroid injection which did not work, and that Yahya could have made a call that would have resulted in plaintiff's earlier referral to the orthopedist. Plaintiff also claims that he told Yahya that he had a torn ligament. ECF 19 at 8. He alleges that Yahya told him that "they" (*i.e.*, Wexford's team) probably did not think that he needed to see the surgeon because he could walk. *Id*. at 6. However, Yahya was scheduled to see plaintiff solely for the scheduled steroid injection. At that time, there was nothing in plaintiff's medical record that indicated he suffered a torn ligament that required treatment. To the contrary, the evidence at that time indicated plaintiff suffered from degenerative joint disease and bone growths.

Even if Dr. Yahya had the authority to refer plaintiff to the orthopedist, as plaintiff claims, there is simply no indication that, under the circumstances presented here, he was deliberately indifferent in failing to do so. To the contrary, the uncontroverted medical records, along with Dr. Barrera's Affidavit, demonstrate that, considering plaintiff's apparent relief from the steroid injection in 2013, it was reasonable under the circumstances to treat plaintiff's complaints of knee pain in 2016 conservatively, beginning with another steroid injection, before referring him to the orthopedic surgeon.

Plaintiff also alleges in his opposition that Yahya's failure to have him sign the waiver form before he administered the steroid injection and his failure to properly sterilize the equipment, resulting in plaintiff's infection, were a result of "negligence" and "malpractice." ECF 19-1 at 9. Even if Yahya acted improperly, as alleged, negligence and malpractice do not state a constitutional claim.

Similarly, plaintiff's claims against Wexford are unavailing. First, Wexford cannot be held responsible under a theory of respondeat superior. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

To the extent, plaintiff alleges that it was improper for Wexford's review team to decline to refer him to the orthopedist in July of 2016, when Bilak first requested the referral, his claim is unsuccessful. At that time, as noted earlier, plaintiff had received treatment of knee pain in 2013, which appeared successful.[4] He presented in 2016, complaining of knee pain, and in June of 2016

---

[4] To the extent plaintiff alleges that he suffered torn ligaments in his knee in 2006, prior to his incarceration, there is simply nothing in the record to support that he in fact suffered from the torn ligaments at that time. Even if he did, there is no evidence that the named defendants were aware of same. Even if plaintiff told various medical providers that he suffered from torn ligaments prior to his incarceration, his ability to walk around, exercise, play basketball, and the fact that he went approximately three years without complaining of knee pain, would suggest that the medical providers did not subjectively believe that plaintiff suffered from a serious medical condition that required a referral to a specialist.

reported that he reinjured the knee while exercising. He was referred for x-rays, which showed degenerative joint disease. The request for referral to the orthopedist was denied, but a steroid injection was recommended. As noted earlier, that assessment appeared reasonable in light of plaintiff's symptoms and presentations. Moreover, the referral to Dr. Yahya for the steroid injection, which proved unsuccessful as a treatment option, delayed plaintiff's referral to the orthopedist only briefly. After the steroid injection proved unhelpful, the request was resubmitted and approved. Plaintiff was then referred to the specialist and ultimately underwent reconstructive surgery on his knee.

Plaintiff received analgesic pain medication, diagnostic testing, orthopedic devices, bottom bunk status, physical therapy, steroidal injections, and ultimately surgery for his knee injury. When viewing the evidence as a whole and in the light most favorably to plaintiff, no evidence exists that the alleged conduct amounted to deliberate indifference on behalf of the named medical providers. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). No exceptional circumstances exist here.

### IV. CONCLUSION

For the foregoing reasons, defendants' Motion for summary judgment will be GRANTED and judgment will be ENTERED in favor of defendants and against plaintiff. A separate Order follows.

<u>February 14, 2019</u>
Date

          <u>     /s/          </u>
Ellen L. Hollander
United States District Judge